The next argument will be in No. 21-870, JLM v. Gutman. Mr. Offer Thank you, Your Honor. May it please the Court, Richard Rothschild for Appellant Haley v. Gutman. We ask this Court to vacate the preliminary injunction against Haley. This is based entirely on misinterpretations of the employment agreement by the District Court. The first misinterpretation involves the noncompete found in Section 9A of the employment agreement. That term, by its plain language, applies only during the period of Haley's employment with the company. And when did her employment cease, in your view? Her employment ceased in December of 2020. At that time, she resigned her employment. JLM accepted that resignation. They stopped her health benefits. Why do you say they accepted her resignation? They're certainly taking the position in this litigation that she has no right to resign under the contract. But at the same time, they sent her a letter saying that because she had resigned, she was terminated from employment and her health care benefits were terminated. It said terminated from employment? It said her health care benefits were terminated. Well, do they have to pay her if she refuses to work? And I would take the point that they didn't say this either. They didn't say she's terminated from employment. They also did not say, come back to work tomorrow and you'll get paid. Exactly. But if they had said that, would this be a different case? No, Your Honor. An individual cannot be forced to work. Well, an individual can be forced not to work for anybody else, right? I learned that in the first year of contracts. Exactly. If there's an agreement that applies past the period of her employment. Well, but you just said this agreement does apply during the period of her employment. And that period of employment ended in December 2020. Okay, so everything turns on that. In other words, if they did say to her, you still work here. Come back to work tomorrow and all is forgiven and you get paid. But we're not going to pay you if you're going to refuse to work. Does that mean that she is saying she's constructively discharged or something at that point? No, all we're saying is that she voluntarily left the employment of JLM in December 2020. And that it is agreed that she has not worked at JLM since December 2020. So wait, if an opera singer, I'm dredging this up from my first year of contracts class. If an opera singer has a contract to work for the Santa Fe Opera for a given season. And then she gets a better offer from the Met. And she says, goodbye guys, I'm going to New York. She can do that and they can't get an injunction that says you can't work for the Met while you're under contract to work for us? But Your Honor, the issue is the period of employment here has to be viewed in terms of the alternative that the district court imposed. And I'm sorry, I'm still trying to focus on the issue is, was this during the period of employment? And the question is, is she still employed in that circumstance? If she's got a contract that says during this period, you exclusively work for us. Are you saying that she can just submit a resignation and go work for someone else instead without the threat of an injunction to say you can't work for them? I understand that the law is you can't get an injunction that says come back to work for us because that wouldn't be very enforceable if she comes in stages of slowdown and effect of productivity. But I thought it was always the case that the employee under contract for a particular period of employment cannot just unilaterally resign and go work for somebody else during that term of employment. Am I wrong about that? Only in this context where the term period of employment clearly means the period that she is actually going to work at JLM. Why do you think, I understand why that, why would I read it that way? Isn't there a period of employment, the period during which she is obliged to be employed by them? No, Your Honor, because this agreement also, and this is what the district court judge did, it applied the word term. And term is capital T term, which is a defined word in the agreement that bound Haley through August 1, 2022. That's the period of the term. And that term applies to various other provisions in this agreement. Right. But it's not used in this noncompetent. And therefore she can walk away from her contract that says that the term of this employment is exclusive employment for us until that date. She certainly can walk away from that because you have to appreciate the context here. Her employer sues her to take away her name, her social media. Those are other issues, right? What the scope of this injunction? You said there is no injunction. The whole case is over and she wins based on the argument that the contract is misapplied by interpreting the noncompete to extend to the time of the contract because her period of employment ended when she quit. That's what we're talking about now. There may be other things where the injunction goes too far. That's another question. That's exactly our position, Your Honor, because if the parties wanted the noncompete to extend beyond the period she was actually working there, they would have used the word term because the term is the period that they had otherwise agreed to. And that ran until August 1, 2022. Let me approach it differently. The contract provides that your client is supposed to receive some royalties after the term or termination. Has she begun receiving those payments? No. JLM has breached and has failed to pay the royalties, including royalties that were due for millions of dollars addresses sold in 2019 and 2020. And that presents another reason for this noncompete provision, in fact, the entire injunction, to be vacated because a party can't fail to perform as JLM has here and then turn around and ask a court to specifically enforce the agreement against the other party. Further, in the noncompete context, there's specific case law that if you don't pay the employee, you're not entitled to enforce your noncompete. So both under the Ryan Walpone case on election remedies and under New York state law on noncompete, JLM has forfeited the right to gain an injunction here. It's elected its remedy, just like in the Nolan Ryan case when it failed to pay Haley royalties. It's relegated to the contract damages at this point. Your Honor, I'd like to turn to the social accounts that are involved here. Before you leave it, you said they don't pay her the royalties and that's some indication that there's no valid contract enforced now. Is that the point? The point, Your Honor, is that JLM breached the agreement. They had a duty to pay her royalties. So it's a material breach that relieves her of all obligations on her part? No, what it does is that JLM would still have its damage claims, but it's an election of remedies, at least as to the injunction as a whole. Wait a minute. You're saying they didn't pay her royalties? Correct. So who then has the damage claims? She has? She has damage claims, Your Honor, that's right. But the obligations of the contract are void. That's correct, Your Honor. Never mind the term, the wording argument for a moment. The failure to pay royalties is what ended the contract because it's a material breach. It's a material breach that ended the contract, and that was the breach that effectively ended her employment as well. She has no duty to appear and go to work based on that breach. So any damages that they have from her not working would be limited to the period between the day of her resignation and the day when they stopped paying the next day of time the royalty check was due? Yes, Your Honor. That was as of March 1. So they would have a damage claim for that limited period. Wait, I thought you were separating the royalty argument from the term argument. Yes, we are, Your Honor. Well, but in Anstead's Lynch, you just went back to the term argument. Oh, no, I didn't, Your Honor. I went back to the time where the royalty payments were due to Haley, which was March 1. The term extends to August 1. So just to be clear, even if we reject your distinction between term and period, if we reject that, you're saying the failure to pay royalties is a breach that releases your client of the non-compete clause is unenforceable at that point where there was a breach by reason of failure to pay royalties? That's correct, Your Honor. Only apart from the term period. Only apart from the interpretation of the contract issue. It's a separate argument. Yes, Your Honor. And on the social accounts, the district court held that Haley independently opened and created those accounts. And as she had done going back to her Facebook account in 2004, she opened it with her own personal email address, username, password. Well, when you say those accounts, one of the things that puzzles me is that we have a fairly extensive record about an Instagram account. And the Instagram account was opened after she went to work for the company. The Facebook account was created before it preexisted her employment here. The injunction, I think, applies to Twitter and TikTok and maybe anything else that she's got. And I don't see much record or much discussion in the briefs about those other accounts. It seems to me the record is quite different. Some of them, as far as I can tell, there's not much record on at all. The Facebook account, there's a record that says she owned this and used this for personal purposes before she ever went to work for this company. And I didn't see a lot there about, as there is about the Instagram account, about the company telling her what to put on it or telling her what not to put on it or negotiating over who's going to actually run it and are we going to have company personnel. At her instance, there's a record that she was asking for the company to provide an assistant to manage this account. There's all that going on, at least with respect to the Instagram account. The Facebook account looks to be quite different. I don't know when Twitter and TikTok started, when those things, when she started on that. But that all seems just not even in the record. So why are we talking about all the social media accounts rather than, for example, just the Instagram account? We're talking about three specific accounts, Ronner, because of Haley's eight accounts, JLM has only sought an injunction with respect to three. The Instagram, the Pinterest, and the TikTok. And you're right, there's no real record developed on those. But my point is that all of those accounts, Haley created in the same way with her personal information. Yes, she created with her personal information after she sold her name to this company, right? I mean, that's part of the problem here. On the one hand, it looks very personal. It's got her actual name. It's got the Instagram account, at least, where there's a lot of record, has pictures of her wedding, which certainly looks personal. Until you think about the fact that she is a wedding gown designer. And I couldn't find it. But is it in dispute that she designed her own wedding dress? I don't believe it is, Your Honor. So you've got an account. I mean, you know, if it was my wedding pictures and the United States, the minister of the U.S. courts said, you've got a Facebook account and you put pictures of your wedding on it. But that kind of promotes the judiciary. And we own that. That would seem a little weird. But if you're a wedding gown designer and you are attempting to become an Instagram influencer, whatever that means, aren't you partaking in the kind of celebrity culture in which you are promoting your name and your brand? She's promoting her name in a very broad way, Your Honor. Yes. Which transcends being a bridal dress designer. She's also using that account, as you point out, for highly personal reasons like everyone who has social media accounts that they create on their own and therefore own. Yeah, but she's also promoting her brand, a fashion brand. And maybe you start out selling whatever Ralph Lauren started out selling. And before you know it, you're selling everything under the sun as a lifestyle brand. And Your Honor, we have significant evidence in the record of celebrities who are designers who have their own personal accounts that are recognized. They created them on their own. They share their lives. And it goes well beyond promoting. But of course, all of these things, I should think, wind up turning on their individual facts, right? It's just like there are people who have a business bank account and a private individual bank account, and they're different. And then there are people who commingle their assets and suddenly we're in a different world. No, Your Honor. I think the analysis that the court should follow begins and ends with how was the account created? And when the account is created using personal information as a personal account, and anyone who accessed that account would see that it said personal account, that a picture of Haley Page. Well, District Court didn't make any findings on ownership, did it? No, Your Honor. In our view, that almost makes it worse because it turned over the full control of those accounts to JLM, yet it didn't say that it was decided ownership. It didn't explain why. Is that right? I'm sorry? I missed the question. It didn't explain why it was turning over control? It did explain, as we understand it at least, the District Court is saying that Haley had some limited advertising duties under Section 2 of the agreement. Those were duties that were assigned to her by an officer of the company and commensurate with their duties as a wedding dress designer. Remember, this is in 2011. And there's no showing in the record that wedding dress designers in 2011 started company-based Instagram accounts. And that isn't what Haley did here. She started a personal account and began posting personal things about her family, her dog. So your argument would be that even if that's what she did that was in violation of the agreement, which you don't agree to, the proper remedy for that would be an injunction saying stop doing that, not giving over the access to the control of the accounts, the property of which has not yet been determined. Take this hypothetical. Let's say that Haley drove around New York City in her own car with a billboard on the top that had dresses on one side and maybe her dog on the other, commingling of things that Judge Lynch was talking about. That wouldn't enable JLM to get her car, take the keys, paint it a different color, and change the character of the account, as JLM has done here. They changed Haley's personal public figure account. It was clearly associated with her. We've seen thousands of comments in the record for that effect. JLM's people admitted that it was Haley's account and they had no control over it and emailed the customers. The analogy sort of presumes the ownership in the first instance. It would be more like if they built it together while she was employed by the company than who gets the keys. Well, first, no one directed her to start the account, and her advertising duties only extend to things that she was directed to do. But what happens when she gets somebody who is employed by the company to answer queries to the account? And what happens when she posts things that are clearly advertising the brand and the company, and the company says, oh, you shouldn't do that in this way. Here, we want you to do it that way. And she changes it and apologizes for using her account in that way. I think it's oversimplified to say this either goes like whoever created it in the first place owns it forever, no matter what happens, and is in charge of the content forever. Then what happens, maybe the answer is neither of them have some exclusive right. But at some point in this, things change, don't they? Well, Your Honor, it was certainly in Haley's best interest, as well as JLM's, to promote the product, just like Aaron Judge has his own account. Writers have their own account. Musicians, they promote their work. They promote their employers. And at the same time, they share their life. Yeah, but Aaron Judge's private endorsement deals, he doesn't get to wear a Yankee hat on without the Yankees' permission, right? Well, that's right. And Aaron Judge didn't sell his name to the Yankees to be part of the Yankee set of trademarks. Haley only sold her name in the context of wedding dress design. She did not transfer the rights to her private interest. She transferred the right to the extent of saying that she can't use it in commerce. Your Honor, I don't see how that can follow. I'm not saying it follows. I'm saying, isn't that the language of the agreement? It's not, Your Honor, because you have to read that section about trade. Wait, wait, wait. Yeah, you have to read it in light of something else. That's what it does say, literally. Yes, correct. Okay, so now you're going to tell me that although it says that literally, there's something in the context that makes clear that it does not mean what it says. So tell me what that is. Your Honor, you have to look at the name in the context of a person's identity. And any type of transfer of a person's right to their name has to be clearly shown. And what's clearly shown with respect to Haley's name is a limited license in 10A of the Employment Agreement, where she says, I'm going to design wedding dresses for you. In exchange, you can use my name on those wedding dresses. That's the extent of the license for Anne. And then in 10B, the Employment Agreement goes on to say, and it's all about trademarks, that JLM has the ability, and Haley gives them the right, to go file trademarks within that limited scope of the license grant. It doesn't say JLM does not. And says the employee, that's her, this is not about what goes to JLM, this is about what she is not to do, shall have no right to use the trademarks, the designer's name, or any similar marks or names in trade or commerce, during the term or any time thereafter, without the express written consent of the company. Now that may be horrible and unconscionable, or God knows what, I don't know what arguments could be made, that you shouldn't be allowed to have a contract like that, that gives away your name. But haven't there been lots of instances in the fashion industry of people making exactly that agreement, and giving up their right to use their name? I'm not aware of any that they give up their right to use their name in any context whatsoever. Not in any context, in trade or commerce. Well that would obviate the entire scope of the limited license. That would give JLM, it nullifies all of 10A, the limited license for JLM to use. No, it doesn't. It doesn't say that JLM gets to use her name in perpetuity, except to the extent that it's been assigned with respect to bridal gowns. But if they're still using it for bridal gowns, and she's using it on garbage trucks, I should think they would have some concern about that. And it seems to me that they are saying, you can't use this name. And it's the agreement. It's what she agrees to. The employee cannot use the designer's name in trade or commerce. I take it that doesn't mean in employment. If she goes to work for somebody else, she can say to them, hi, I'm Haley Page, and use that name on her paychecks or whatever. But she can't have a brand, Haley Page. Now, again, I'm not saying this is legal or anything. Maybe we should be talking about that. But I'm having trouble understanding why it doesn't mean what it says. It doesn't mean they can set up a line of garbage trucks under the name Haley Page. It says that she can't. Here's what I think it means, Your Honor. First, you're not reading the entire sentence there, which talks about the trademark shall in perpetuity be the exclusive property of the company, the employee having consented to it, and employees shall have no right to use the trademark. Yes, exactly. Exactly. No right to use the trademarks. Or the designer's name. Two different things. If it meant what you're saying, they wouldn't need to put designer's name, would they? They would just be conveying, she would just be forbidden to use the trademarks, which presumably extend only to bridal stuff and whatever could reasonably bridge the gap or all of those trademark law doctrines. But it doesn't say that.  It means the items within the scope of the license in 10A that Haley has not been used. So what it means is Haley can't go start a bridal business under Haley Gutman. That's a designer name. It's within the scope of the license. Can she design other kinds of clothing and use the designer's name?  What about perfume? A lot of designers sell perfume. There's Ralph Lauren, Chanel No. 5. I think in that instance, she's not contractually prohibited from doing that because the license agreement, the only rights JLM has are to her name in the bridal product. That's the right they have to use it. Isn't that distinguished in New York law from the right of other people to use it? Your Honor, they're protecting themselves here, it seems to me, against her using a trademark content, the name Haley Page, that has built up considerable equity in the bridal gown market in other forms of trade or commerce that might be problematic. They might or might not violate trademark law if it's sufficiently distant from bridal wear, but I'm having trouble understanding why this doesn't say we want more than that. What it says it's more than that is the designer names that have not previously been used, and that's the added protection that JLM is seeking. Beyond that, to your point about equitable relief, Your Honor, to enforce an agreement like that in the face of the authority in this court, such as the Brennan case, where to take away someone's entire identity, to prevent them from using their name, is something that's a grievous injury that this court will avoid at all costs, and Haley certainly has suffered that grievous injury. She can't work in her chosen position. Well, right now, and this is another issue, she can't do this until August 1, 2022. That's what the preliminary injunction says. That's the expense of the P.I., non-compete. Yes, that's correct, Your Honor. But as to the name, essentially this gives JLM a veto right over her using her name in any contract. It may or may not, but does the preliminary injunction go that far? The preliminary injunction says that, but you cannot use her name. So the preliminary injunction uses the language of this contract.  We disagree with the interpretation you forwarded. We think that that cannot be the meaning because it would nullify and it would not be appropriate in terms of taking away someone's entire identity. What JLM bargained for was Haley would make dresses, they would get to use her name in bridal. If they have a problem with her using her name outside of bridal, they can bring a lawsuit and claim that it somehow is diluting or affecting their brand in a negative way. Thank you, counsel. You reserved a minute for rebuttal.  Ms. Matz? Good morning. May it please the Court, my name is Sarah Matz. I'm the firm of Adelman Matz, and I represent the plaintiff, FLE, JLM Couture, Inc., in this case. I'd like to start by addressing a few of the issues that Mr. Rochford was just addressing with the Court. As an initial matter, our position is that Ms. Guttman has failed to show any abusive discretion in either the way the Court interpreted the contract or interpreted the facts of this matter. There is, in fact, a very heavy factual record here. With respect to Section 9A of the agreement, which was included in the injunction as Section 3B, the noncompete, the Court absolutely properly interpreted that that was, in effect, during the entirety of the period when Ms. Guttman was supposed to be employed. The contract here is very clearly a contract for a term. And that word has several different meanings, both in the legal sense that we all use it. It also has a defined term in the agreement. In the agreement, the term was actually only defined as the initial term. And then, through both the original 2011 agreement and the 2014 agreement, JLM was given several exclusive options to extend the term of the contract. And JLM did that. There is no dispute about the fact that JLM validly exercised its right to extend the period of time when Ms. Guttman was supposed to be performing exclusive services. Right, but what if they fired her? What if they said, you know, you're sorry, your gowns aren't working out, the purple just isn't going to be a bridal color, goodbye. You're gone, you're fired. And they have the right to do that. They have the right to do that. And after that, I take it the most you could claim is, if that happened in year one, the most you could claim is a non-compete for two years thereafter. I think that if we're in a hypothetical world, that had JLM terminated, there's two termination provisions, one for cause and one without cause, and they have different outcomes, which would have shortened those obligations. But that's not what occurred. And one of the important things here to remember is that Ms. Guttman did not have any termination right under this contract. The only termination right under the contract belongs to JLM. The district court also properly held that interpretation of Section 9A in the way that Ms. Guttman is advocating it here would conflict with that fact. Ms. Guttman has not appealed from the court's determination that she had no unilateral termination right. And the court further held that her purported resignation was ineffective because of that. She sent the letter, but it didn't mean anything. But Mr. Rutford says that as of March of 2021, I take it, not 2022, which hasn't happened yet, JLM stopped paying the royalties. Why are the royalties – don't her royalty rights extend in perpetuity? So there are two different types of royalties, and I would like to address the first one, which is what the district court talked about when it rejected dissolving a preliminary injunction. The first type of royalty is what is called additional compensation. That is a calculated net formula that Ms. Guttman was to be paid during various fiscal years for certain types of products. That's while – under certain circumstances. However, the contract very clearly has a condition precedent in it, both for her base pay and specifically with this additional compensation. And if you look at the 2014 amendment, paragraph 3F, it very clearly says – there's a very clear provision in the contract that says that to the extent she stops designing two collections – either of two collections, the Jim Helm or another collection, that she will no longer be entitled to any of that compensation. And there is no dispute that she stopped designing the Jim Helm collection in 2017. So to the extent that my client, while she was still working there, continued to pay for some of that, even though they were not obligated to, whether it was a mistake or something else, does not mean that they are continually obligated to do that. The district court properly – Wait a minute. You said there were two kinds of royalties, and you said that as to one of them, it's linked to compensation. There's another kind of royalty? There's additional compensation, and then there's the additional consideration. And that – the additional consideration is tied to – the additional consideration kicks in after the term of when she is supposed to be employed. So that obligation has an arisen period. The district court has held that the contract is still in effect, so my client has no obligation to say that. My client has no obligation to say either of them at this point, given Ms. Gutman's failure to perform. And as we set forth in our paper, this is part of the reason that their argument that there was an election of remedies completely failed. My client cannot be accused of breaching its obligation and be accused of having failed to perform some obligation and thus having elected a remedy when its obligation to perform never arose, because as the district court held, Ms. Gutman failed to perform a conditioned precedent. It's very well-settled law in New York that where a conditioned precedent is not performed, there is no obligation. So my client simply cannot be accused of not performing in this circumstance. All right. With respect, maybe this is what you're saying. With respect to royalties, are you saying the only royalties they failed to pay are those that accrued or would have accrued after she declined to work? Is that your point? I am saying that the only royalties they did not pay were those that accrued during the 2020 fiscal year and that they were not obligated to pay those because the language of the contract very clearly says that if she doesn't design either the Jim Helm or the other collection, the Jim Helm is the one she stopped designing, that none of those royalties have to be paid. Which accrued from that point forward or previously? Previously. Are you saying she forfeits accrued royalties by failing to design in the future? No. I'm sorry. Let me give you the timeline. In 2017, she stopped designing the Jim Helm collection. At that point in time, she stopped being entitled to those additional royalties that we're talking about. Well, that's what I'm trying to understand, additional. Those that accrued thereafter? Yes, that accrued thereafter. We're not talking about those already accrued at that point. Correct. I am not talking about the 2016 royalties. There's no dispute those were paid. The royalties that Jaylen is being accused of not paying are accrued during the fiscal year of 2020, and there is no dispute that she stopped being entitled to those as of 2017 when she stopped designing that collection. Is it different from what's called for under Section 10C? Yes, it is. It seems like you're trying to have it both ways. She's terminated for one purpose but not another. Well, we're not saying she terminated. She stopped working. Jaylen has been ready, willing, and able to perform. Ms. Gutman has refused to render services, and she should be. I don't think if the term Jim Helm collection appeared in any of the briefings, I'm sorry, but I missed it. So I'm trying to understand what you're saying. This dispute didn't come to a head until much later than 2017. Correct. So when she stopped designing the Jim Helm collection, did she walk into the boss's office and say, screw you, I'm not going to do this anymore, or was there some agreement that she should focus on the Haley Page mark and let somebody else take over? In other words, did she breach the contract by stopping to design the Jim Helm collection, or was that by mutual agreement? So my understanding is that there was a discussion. No one is saying it was a breach. We are saying it was a very clear condition precedent in the language in the contract report. But that clear condition precedent was not waived in any way. I mean, this is starting to sound to me like an after-the-fact argument, and I'm trying to see whether it is or not, that they're humming along. She's making herself famous on TV or whatever and doing her Haley Page collection, and it's getting very popular. And at some point, without objection from the employer, she stops doing the Jim Helm collection. And you're saying that at that point, she forfeited the right to royalties for anything else, even though, in fact, then you can keep paying it until this other dispute came up. That's your argument about why the royalties, she's not entitled to royalties anymore? Yes, it is. And the contract very clearly supports it because the contract says, if it is determined that she's no longer going to be doing it, that she won't be paid any of the additional compensation. And it actually very clearly lists out both paragraphs for the additional compensation for both the Jim Helm collection and the other collections were listed. And the other collections include the Haley Page collection? Yes. So that's a tough call for you. Well, the other thing I will say is that none of this was raised in the preliminary injunction. It could have been raised. And Judge Klain very clearly held that it should have been raised. With what frequency were royalties paid? The royalties were paid, I believe it was yearly. They would have been due on March 1st. Technically, the calculation would have been performed by January. Ms. Gutman sought expedited discovery on a variety of topics. This was not one of them. She had every opportunity to seek expedited discovery on this topic. She admits her, you know, the letter that she sent in March purporting to, again, try to terminate the contract which the district court held was also ineffective. She listed a bunch of actions that happened in December. One of them was that her COBRA was terminated. One of them was that Dale unstocked her base pay. And then she said, by the way, there's also this money that should have been paid by March 1st. Right. So this case is a bit of a moving target, right? At one point, there was a big dispute about whether the termination of her salary after she submitted her purported resignation was the alleged breach that she claims ended her employment and therefore ended the period of employment part of the non-compete. And then at a later point, after the injunction is issued, comes the March royalty date and she doesn't get paid. And then she comes back and asks to dissolve the injunction based in part on that? No, that's actually not accurate. Ms. Gutman didn't raise any of the issues, including the ones that arose in December, which referenced the preliminary injunction. Ms. Gutman waited until after the court wrote a 60-page decision to try to make a motion to dissolve to make the argument that because JLM terminated her health insurance, stopped paying her base salary, and the additional compensation, the entirety of the injunction should be dissolved. And those were not new facts that occurred after the injunction was issued. Those are facts that existed at the time of the initial litigation over the preliminary injunction. All of them? Except the royalties. Well, the royalties existed before the injunction was issued, albeit by a few days. However, again, the standard for trying to raise new evidence after a decision has been rendered is that you either could not have known about it, you did not know about it, or could not have known about it with any type of diligence. There's absolutely no diligence exercise here. The other side completely ignored this issue and tried to raise it as a stopgap when their other arguments failed. Can I ask one other question about the term of the preliminary injunction? Originally, the preliminary injunction did not say when it would end. It would end when the litigation, I guess, was finally resolved, like most preliminary injunctions. And then at a later point, I think in response to the dissolution motion, but you can correct me if I'm wrong about that, the court said, no, no, no, this is only during the period of employment, and it's going to terminate on August whatever date, 2022. So it's not the entirety of the preliminary injunction? I'm just going to correct one thing that you said. What you are talking about is paragraph 3B of the preliminary injunction, which is the incorporation of the non-compete. Originally, the court, although I personally believe it was very clear from the court's order, because we were arguing that it was effective through August 1, 2022, and in various places in the order itself, the court said the contract is in effect through August 1, 2022, so so is the non-compete. But in the actual final paragraph where the injunction is listed, it did not say until August 1, 2022 when they moved for reconsideration. Obviously, again, that was what we had argued, so that's when the judge made that one small clarification. But so Mr. Rochford is right, though, when he says that the other provisions, the control of the social media accounts and the injunction against using her name in trade or commerce, those extend indefinitely until the resolution of this litigation. They don't end in August 2022. That is correct, and with very good reason, because the provisions of both the contract and then also the trademark law, because there's kind of a dual rationale behind all of these, and that is the provisions of the contract do not have the same cutoff. Section 10B of the contract very clearly says that Ms. Guttman, at any time during a term or any time thereafter, will not have any right to use the trademark, the designer's name, for any commercial purpose, okay, in trade or commerce, excuse me. Section 12, which deals with various post-term release, also says the same thing, although it actually goes one step further and says she can't use them for any purpose whatsoever. These were negotiated for and bargained for provisions to protect JLM's brand. JLM is a mature bridal house gown. The price points of their gowns, and this is in the paper, are several thousand dollars. We're talking about a very prestigious and luxury brand. And the entire purpose behind ensuring that Ms. Guttman could not go out and start another commercial brand with this was to protect that from the exact type of harm and dilution that she was causing. Ms. Guttman started endorsing Nickelode Ultra, an optimum way of protein powder, salad dressings, and oils. Can we turn to the social media accounts? Yes. If we were to assume, and I know you dispute this, but if we assume for a moment that the social media accounts, the three of them that we're talking about, are owned by Guttman, then what would be the basis for the district court granting control to JLM over those accounts? So you're right. We do not concede that point. It's very heavily contested. So the first basis is that the district court held, and again, Ms. Guttman has not challenged this, that JLM does own almost all of the content on the account. She actually said almost the vast majority of the content. But that's different from the account itself, right? My understanding is that followers, which seem to be the asset at issue here, go with the accounts, not the content. I would not agree with that. There's a lot of case law that we have presented in some of our briefs. This is a fairly novel issue, so it's from district courts and other courts around the country, but there's a lot of case law that says followers are like customers lists. They are a form of goodwill. And I don't know how anyone could think anything else. In this case, the majority, over 95% of the content on this account is promotion of JLM's bridal goods. So over the years, as people were following this account, they were following a bridal design company. And whether or not Ms. Guttman was the face of that is a different question. That was actually her job. There's many social media accounts. Mr. Rochford mentioned this. There's many types of brands that when the name is taken after an individual, that person has both a personal and a brand account. Martha Stewart is a perfect example. There's the Martha Stewart account that is run by the Martha Stewart Company, and then she has a separate personal account. Here there only was one, and this was the company account. It was started from the beginning to be the company account. The idea that Ms. Guttman, these duties were not commensurate. So I guess my concern is the district court didn't make a conclusion about that issue, who owns these three accounts. And so not having done that, I would think that the thing to do would be to preserve the status quo and then issue an injunction saying stop violating the agreement, not transferring control that previously Ms. Guttman had. Well, Ms. Guttman actually did not previously have control, and that's another very disputed issue here. So one, the court found that we owned all the content. Well, then what does the injunction do? I mean, if you already owned it, then? She changed the password and then stopped posting our content on November 23rd, and we came into court on December 15th. So up until that point, Ms. Guttman, because it was part of her job as an employee, was posting the account. And for much of the time period in question, other employees also had the password and had been posting to the account as was part of their duties. There's many communications in the record where Ms. Britton Ngo, who was one of her kind of day-to-day people, was in the account all the time, responding to DMs, creating captions for her, doing all that. This was a joint effort. And yes, Ms. Guttman did a lot of it, and she did it well because that was part of her job. So I'm still struggling with it. So just assume for a second it's hers. And I know the district court didn't find anything about that, but that's my problem. Then what would be the basis for saying in the injunction that you have to give over control to the company? So one is that Ms. Guttman couldn't continue to use the content because it was owned by JLM. Number two is she had a duty to continue to assist with advertising. Number three is you couldn't give the account to Ms. Guttman and just say change the name. It would absolutely destroy the status quo because all of those consumers, all of those people are customers of JLM. Ms. Guttman herself admitted the vast majority of the DMs that came in, and this is in e-mails from her, were inquiries into where to find various dresses. So the alternative that they have presented is wholly not viable. That she should be able to take the account with all of our bridal, our customers, our content and everything else and just change the name and steal all of that goodwill? That's not preservation of the status quo. But JLM also showed that the continued use of this account and being allowed to promote and use it as it had been for over 10 years was an incredibly important part of its marketing plan. Can I ask you something different? Sure. In the addendum with all the social media accounts, how is that assembled? It seems like this report maybe didn't kind of go through them individually to accept that there are differences between them, but I don't know where that list came from. So that list is Ms. Guttman had historically had access to many of JLM's accounts, including the three at issue. There's really only three that are heavily in dispute. The majority on that list, it was never disputed by Ms. Guttman that JLM owned. And what we did not want to happen, though, was have her log in and start posting things that she had been on the Instagram account or that we did not approve of. So there's really only three where the ownership, we'll say, is in dispute, and that's the Instagram account, the TikTok account, and the Pinterest account, all of which were started after she commenced her employment with my client. Does the record show when the last royalty payment was made? In the motion for dissolution, yes, we did present summaries of the various royalty payments throughout the years and the totals that she had been paid. So from that document, we can tell when they ended? I believe so, and I believe that the last one was paid in— Okay, if it's there, that's all I want to know. Yes. Did the district court make any findings that royalties did not have to be paid thereafter? Yes. The district court expressly found that there was a condition precedent and that as there's a no waiver provision in the contract, that that had not been waived, and that my client's obligation or alleged obligation to pay in March 1 of 2021 had not actually arisen because Ms. Guttman had failed to perform. A finding which, I will add, Ms. Guttman did not— it was an argument jail made in opposition, it was not addressed on reply, it was not addressed at oral argument, and it's actually not even addressed in their brief here. They have made no argument to explain why the district court or why they believe the district court was wrong in this condition precedent finding. Could I go back to the non-compete and the term of the injunction? Yes. The term of the preliminary injunction for the non-compete extends to August of 2022. Now, I thought that the contract extended the non-compete for two years after the end of employment, and what I'm wondering about is, A, am I wrong about that, which would avoid this whole issue, but if it does say that, has the company abandoned that claim or is it just that maybe the case will be over by August 2022 or maybe come August 2022, if the case is going on, are you going to be back asking for two years more? Is that just not something that, is that still an open possibility in your view? So I think I know the provision you're talking about, so I'm going to do my best to answer the question. So the non-compete that is in paragraph 9A of the employment agreement is until August 1, 2022. After that, there is a separate provision in the contract that is 10E that says that in the event company files an application to register the trademark or trademarks, employee agrees for a period of five years following her termination, she shall not be identified to the trade or consuming public as the designer and her role as a designer shall not be used to promote the sale of any goods in competition with goods manufactured and sold by the company. So my understanding of this is that it is a different provision. We did actually ask for enforcement of that when we filed the motion. What Judge Swain ruled is that because she's given up the non-compete, it was not yet right. So I do anticipate that we will be back, but it is a much more, it is a more limited provision and it's about her identifying herself to the trade and consuming public as a designer so that she cannot end around run this prohibition. So she could not, in your view, under that 10E provision, and I realize this is not in the injunction yet, but that you might seek one at an appropriate time where you have sought it and it's not right according to the district court and when it becomes right, you might well seek it. She could not take out an ad with her picture on it saying, hey, you know me from my fame on television. I can't tell you my name thanks to the suits, but I'm now going by Ashley Judd and I'm now working for some other company. I'm working on my own and I'm designing bridal gowns. You would think that 10E prohibits her from doing that. Yes, I would agree with that, and I think the reason is actually very obvious, that we don't, we negotiated so that another company, even though the non-compete was only for a specific portion, we negotiated for a provision that would in effect prohibit another company from hiring her for her name value and saying, Hayley Page is our brand new designer. Come get our gown. Hayley Page is a designer, which is in essence a use of the name in commerce and not just in commerce. Even if they don't use the name, if they use her face, if they capitalize on her celebrity in some way, that would, in your view, extend well beyond August of 2022. Yes, it would, but I do not think it would. But that's not for us because that's not part of the preliminary injunction. Exactly right. That's not currently part of the preliminary injunction. The other thing that I would just like to add is that I do think it is very important. There is an extensive record here about communications, and while I understand the court did not rule exactly on the account ownership issue, Judge Klain did rule very clearly as to all the contents of the account, and that was both under the agreement itself, Paragraph 11, common law work for hire, and the extensive evidentiary record here that shows that from the very beginning Ms. Guzman's one of her primary roles was actually to develop these social media accounts. So the idea that now they're coming forward and saying this was never one of her responsibilities, it's not measured with her position as a designer, is frankly completely disingenuous. She sent an email right before she started, and I would just like to point you to this. It's one of many examples in this record. It's at 1109 of the main appendix, where she was very excited to start and said, let me know when I can start helping with the Facebook and Twitter pages. So from the very beginning, it would absolutely discuss that this was part of her duty. So any suggestion that it was not is just completely contradicted by the record here. Okay. Thank you, Counsel. Thank you very much. Mr. Rochefort, you have a minute for rebuttal. Thank you, Your Honor. I mentioned a few things in rebuttal. First, Your Honor, Judge Park recognized there are a number of social media accounts in the appendix that are JLM's brand accounts. So when Counsel said this was the only account, that's not correct. JLM had a JLM Couture Instagram. It had an Instagram account for each of the Haley Page lines that was designated and told the public it was a corporate account, and that's where they posted their dresses. In contrast, Haley has her personal account, but everyone looking at the page knows it's Haley personally. And, yes, she also used that to promote, but she used it to tell her life, and it's easily distinguishable from the corporate accounts as you look through the record. So the idea that JLM had focused all its marketing on this one account is simply not true. Now, as a matter of fact, Haley's account had 5 to 10 to 20 times more followers than the JLM account, and that's because of Haley, because people wanted to connect personally with Haley. She responded personally to hundreds and thousands of direct messages from brides. She told them about her marriage, her divorce, her dog, her family, her interests, her mental state at various times. That's not cognizant. That's not commensurate with marketing views. Yes, it was in Haley's interest to promote the bride, but it's her account. Because there are things other than a bridal gown that makes a difference. Why don't they just stop showing the bridal gown? Exactly, Your Honor. Is that the point? Yes. She kept displaying the bridal gown. The proper scope would be allow Haley to get her account back. That is, in fact, the status quo. It was her account, and give that back to her. Did she say to the district court, that's what I'm willing to do? To remove the content? The bridal gown content. Yes. So she told the district court that? I don't think that came up, frankly. Well, that's what I don't understand. You're saying there's all this other stuff that's there. The district court would have ordered Haley to keep the account, maintain the keys to her car that she owned and registered, and at the same time take down whatever copyrighted photographs that JLM, by the way, had given her to publish. Here you are saying there's a lot of other stuff on that account, and its presence there is what makes the transfer illegal. Is that it? That's part of it. All right. Why did you, as the party being enjoined, say, Judge, don't enjoin us for that. Just enjoin us from the bridal gown. That's a fair point, Your Honor. I believe that was clear that Haley should retain control of herself. Can you still do that? Go back to the district court and say, Judge, it's the bridal gown that it's about. I'll represent to the court right now that Haley is very welcome to take down any JLM-originated content from the account. But it's not just the bridal gown because they would say it's the name. She would change the name of the handle. That's to the extent there's any remedy. You're saying she would be agreeable to changing the account to something that does not have her name on it. And we've said that. And that takes out all the JLM content. Absolutely, Your Honor. And we've said that extensively at the district court, that to the extent there's any remedy, it would involve a change of the name. That's where the issue is, the so-called handle at Ms. Haley. Well, the name ends, as Judge Newman was asking, the bridal content that has to do with JLM stuff. Correct. But how is that different? I don't know. When I read this, I was thinking, gee, they're trying to turn her into either a nun or a federal judge. I don't have any social media accounts. I don't know quite how this works. I don't know what it means to own an account. I don't know what it means to own the content. I understand that some things might be copyrighted. I don't understand why JLM cares to or wants to have pictures of her dog on their website anymore now that she's not actually doing anything for them. But it's one thing to say, I own the copyright to the picture of my dog, and they own the copyright to the pictures of the runway show or something like that. It's another thing to say they don't own the... and that they don't own any Instagram account she could open with a different name on it. Or she could change the name on this one. I mean, what... I don't... The difference between her opening a new account with a new handle and all the non-bridal dress stuff, the stuff about her dog and her family and her philosophy of life, that can still be on an account with a different name. But that's different than this account because of the desire to monetize the people who are already following that account. It's purely commercial. It's not about the dog. It's not about her personal thoughts on life in general or whatever other nonsense people generally put on Facebook or on Instagram. It's about cashing in on the ability to use this account to communicate with people who were following this account because of some combination of they liked the dresses that they learned about one way or another, and they liked her from seeing her on TV. That's what this whole thing is about. It's beyond that, though, Your Honor. It's not purely commercial, although absolutely. Hayley's account that she created and nurtured and spent thousands of hours over a number of years, albeit sometimes with assistance from JLM for a brief period of time, that has commercial value, $28,000 every post. And that's a lot more than the JLM corporate accounts. JLM keeps its corporate accounts. Those are theirs. They own them because they started them in a corporate name. To your point about not really understanding social media, Your Honor, it's almost like a bank account. You go on the website, you put in your username and your password, and that gives you access. But what's really going on here is she got famous in large part because of the work that she does for this company.  and it is very intertwined between her and the company. And now the question is, she wants to be the one to control continued communications with the people who signed up for that account. That's what this litigation is all about. That's a big part of it, and that's because that was the standard. Because they're going to give her the dog back, and you're going to give them the specific pictures of the bridal gowns. Nobody cares about that, really, at the end of the day. They care about monetizing those followers. They do care, Your Honor, and that's the point. If you look at the record, Haley's followers, the posts that got the most attention by orders of magnitude are when she posted about her engagement in recent years that had nothing to do with JLM. She posted a video about her engagement. She posts dance parties and fake-offs and things. And Haley has become famous not just because she designs dresses. There's a lot of people who design dresses. But because she has a unique relationship with her brides. They know she's accessible. They know she's going to respond to their social media. Yeah, but when you say her brides, it's not just like random people who respond. They like the dog. There are plenty of dog websites. There are plenty of people talking there, expressing their personalities on Instagram. But she's a celebrity about bridal gowns. It's her brides, you say, when these are her brides, to the extent that they bought bridal gowns that she designed for JLM as part of her employment. That's what made them her brides. That's how you define her brides. It's her design that JLM had the right to sell and pay her royalties on. I got it. Okay. But again, compare the corporate accounts with Haley's account. You see the added value of Haley's personality. What do you say about their point that the royalties were not due for failure to fulfill the condition precedent? Your Honor, that's not accurate. And first on that, two points. JLM paid those royalties to Haley. They claim that in 2017, Haley somehow breached the agreement by failing to... You're talking about the condition precedent. That was their argument. She didn't fulfill the condition precedent, and thereafter, they stopped paying royalties. That's their point. What do you say about that? That's inaccurate, because they continued to pay Haley after she stopped designing the JLM home dresses. They paid her royalties in 2017, 2018, and 2019. They never raised this issue until May of this year, where, for the first time in response to our motion to dissolve the injunction because of the election of remedies and the material breach for failure to pay royalties, they said, we don't owe her royalties because she stopped designing Jim's home back in 2017. Well, they waived that argument. They paid her every single year after that. And the argument itself is a red herring. You're saying it's a waiver because they paid? Why is that a waiver? Why is it... If they waive the right to come in now and say they're excused from paying her royalties now because they paid her royalties on the sales of all the Haley page dresses for four years after this supposed breach by Haley in not designing Jim's home anymore. But as Judge Lynch pointed out, that's a red herring anyway, because you're right, Your Honor, if you surmise, and Ms. Matz indicated there was a conversation, Haley and the CEO of JLM met and decided that it was no longer profitable to pursue the Jim home line. And in place of that, Haley designed new Haley page branded lines. So they come in now four years later after paying her throughout that time these royalties and say for the first time, we're not paying you because you breached, but instead in response to our motion to dissolve. Just to be very clear with the motion to dissolve. The motion to dissolve was based on the failure to pay royalties or is based in principle part back on the already existing, but sort of newly presented to the district court argument that they had breached and made their election of remedies when they stopped paying her medical insurance and her salary. Your Honor, we did not bring the motion to dissolve until after the royalty payment was due. And the argument was, this is the new facts, Judge. This is a critical breach, right? You know, arguably there's some reason that not paying her benefits. Is the court really going to say that's a material breach that dissolves the entire injunction? But failure to pay her hundreds of thousands of royalties on millions of dollars of dresses had only ripened as of March 1. The court issued its preliminary injunction decision, which of course we didn't know when that was going to come out, on March 4. We sent JLM a letter saying, we are terminating the contract because you have breached it by failing to pay Haley her royalties that were due on March 1, hundreds of thousands of dollars, as well as the other issues about failing to pay her regular compensation and her health benefits on March 18. And then we thought, we never heard anything. They never raised this issue. Then we filed the motion to dissolve. Just looking back at your argument to this court, it's always hard to figure out. It's a lot of work to find what you said to the district court. But it's pretty easy to look at what you said to this court. The additional compensation is one paragraph on page 55. There's no argument really that distinguishes that and says that's what changes the ballgame. The argument is devoted to their failure to pay compensation in total. It made us enough to preserve it, but I was feeling a little bad about it. I didn't pick up this thing about the royalty payments. It's pretty well buried in the brief. Your Honor, there is a full paragraph on the top of page 55. Yeah, that's the one I'm referring to. That's a reference to the additional compensation. Those are the royalty payments. I understand they are. Yeah, I understand that now. In any event, Your Honor, we believe that the material breach by JLM necessitates the dissolution of the injunction. In closing, if I might, Your Honor. Very briefly, please. Yes. Here's where we are. We have a preliminary injunction in place that prohibits Haley from working in her chosen field, even though the agreement stopped when she stopped working. She was compelled to turn over highly valuable personal property in the form of her accounts, even though there's nothing in the employment agreement that transfers those. There's no document anymore. Finally, I want to just briefly mention the contempt order that's been entered. Is that on appeal? It's on appeal separately. Separately. But we would like to ask this court to stay the contempt order pending resolution of this case. And the reason for that is the district court is using the preliminary injunction, particularly paragraph three, the non-compete, to preclude Haley from working. Has a motion been made to that effect to this court? Yes, it has. And it was referred to the merits panel. Okay. So that's before us. And we've got papers on that. Yes. Okay. Well, we have simply had it referred. And, yes, a motion has been filed, and it's before the court. And the key thing to note is that the district court has interpreted non-compete so broadly as to prohibit innocuous conduct. Haley talking about this case. Haley talking about future plans with a new brand that does not involve her name after August 1, 2022. Haley doing five-second sketches videos that she posted on an account. Is there a motion to consolidate the contempt appeal, or has there ever been a motion to consolidate the contempt appeal with this appeal? No, Your Honor. Would that make sense? I mean, I'm just trying to figure out what it is that we are supposed to do now, that you raised for the first time, 15 minutes over time into your one-minute rebuttal in this case. That, you know, if we were to enter that stay because of what's going on in the contempt and the contempt appeal is still pending, what stage is that at? Have briefs been filed? Not yet, Your Honor. Not yet, okay. We don't have a schedule. Okay, well, we'll just look at the motion then. Thank you, counsel. We have your arguments. Thank you. Thank you both. We'll move on to the next argument for today, number 1922.